**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 5, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 12-2084

EDWIN TORO SANCHEZ, SR.,

Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 2:10-CR-02387-WJ-1)**

Caren I. Friedman, Santa Fe, New Mexico, for Defendant - Appellant.

Laura Fashing, Assistant United States Attorney, (Kenneth J. Gonzales, United States Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff - Appellee.

Before **HARTZ**, **BALDOCK**, and **HOLMES**, Circuit Judges.

**HARTZ**, Circuit Judge.

Defendant Edwin Sanchez appeals his conviction in the United States District Court for the District of New Mexico on one count of possession with intent to distribute 100 kilograms or more of marijuana, *see* 21 U.S.C.

§ 841(b)(1)(B)(vii), and his sentence of 78 months' imprisonment. The marijuana was found in a shed behind Defendant's home and in a detached garage on the property. The affidavit for the warrant to search the home made no mention of Defendant, who had not been implicated in the drug-conspiracy investigation leading to the search. The home was searched on the mistaken belief that it was the residence of an identified member of the conspiracy—Defendant's daughter. At trial the government tied Defendant to drug trafficking by providing telephone records showing many phone calls between Defendant and a drug trafficker.

Defendant argues that (1) factual errors in the search-warrant affidavit required suppression of the evidence obtained in the search; (2) the telephone records should not have been admitted as evidence because they were unfairly prejudicial; (3) the district court erred by denying him a minor-role sentencing adjustment; (4) the court's finding that he gave perjured testimony during trial was not sufficiently independent of the jury's verdict to support a sentence enhancement for obstruction of justice; and (5) his sentence is substantively unreasonable.

We hold that (1) the errors in the affidavit do not undermine the magistrate judge's finding of probable cause; (2) the phone-record evidence was relevant, and its relevance was not substantially outweighed by the danger of unfair prejudice; (3) the district court reasonably found that Defendant had not proved that his role in the offense was minor; (4) the court's factual findings supported

its imposition of the obstruction adjustment; and (5) Defendant's within-guidelines sentence was substantively reasonable. Thus, exercising jurisdiction under 28 U.S.C. § 1291, we affirm. We summarize the relevant evidence as we discuss each issue in turn.

## I. VALIDITY OF SEARCH WARRANT

In June 2010 officers of the federal Drug Enforcement Administration (DEA) obtained a warrant to search 4113 Barbara Vista in Albuquerque for documents relating to a drug-trafficking organization and for proceeds from the trafficking. The affidavit supporting the warrant linked Defendant's daughter, Adriana Amaya, to drug trafficking. It recounted intercepted conversations among members of the drug conspiracy setting up meetings with Amaya and referring (in code) to currency that Amaya was to pass along for delivery to a drug supplier in Mexico. Amaya herself participated in some conversations, arranging meetings and, at least once, referring to money she was going to bring to a meeting. On one occasion a conspirator gave Amaya's cell-phone number to another conspirator, who promptly called Amaya. The phone company's records showed that the number was subscribed in Amaya's name with a listed address of 4113 Barbara Vista. The affidavit further stated that DEA officers had determined that 4113 Barbara Vista was Amaya's residence "[b]ased on information received throughout this investigation from state and local databases." R., Vol. 1 at 150.

Some statements in the affidavit were undisputably wrong.  The most significant error was the statement that "[t]hroughout the course of this investigation, agents have conducted physical surveillance, video surveillance and have spoken to some participants in order to confirm the owner or resident of each residence." *Id.* at 149–50.  At the suppression hearing in district court, the DEA agent who prepared the warrant application conceded that no video surveillance of 4113 Barbara Vista had been conducted and that physical surveillance had not confirmed that Amaya either resided at or owned the residence because Amaya had never been seen there.  The affidavit also stated that agents saw "several video cameras strategically affixed to the residence," and that "[t]he residence is surrounded on the west side by an 8 foot cinderblock fence that wraps around the north side of the residence concealing it from public view." *Id.* at 150–51.  The affidavit suggested that these security measures showed that the residence was equipped as a "fortress" suitable for "protect[ing] either narcotics and/or bulk currency." *Id.* at 151.  When officers executed the warrant, however, they found only one camera affixed to the residence; and the cinderblock fence turned out to be only five or six feet high.  They also discovered that Amaya did not live at 4113 Barbara Vista, but her father, Defendant, did.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  "Probable cause to issue a search

warrant exists when the supporting affidavit sets forth sufficient facts that would lead a prudent person to believe that a search of the described premises would uncover contraband or evidence of a crime." *United States v. Sanchez*, 555 F.3d 910, 914 (10th Cir. 2009) (brackets, ellipsis, and internal quotation marks omitted). "We afford great deference to the issuing magistrate's probable-cause determination unless there is no substantial basis for concluding that probable cause existed." *Id.* (ellipsis and internal quotation marks omitted).

Defendant argues that probable cause to search his house was not set forth in the affidavit for the warrant. He first contends that "[i]t is important to remember that when the Government submitted the warrant application for the search of Defendant's home, it had no information at all concerning him." Aplt. Br. at 27. True, but irrelevant. It is undisputed that Defendant had not been a target of the DEA investigation and that the application to search 4113 Barbara Vista was premised on the belief that Amaya, who *was* one of the targets of the investigation, resided there. Although this belief turned out to be erroneous, probable cause is not certainty, and there is no constitutional requirement that evidence acquired in a search be used only against persons suspected of wrongdoing when the search was initiated.

A more substantial objection to the search is that the affidavit contained "patently false information." *Id.* Defendant contends that "nothing could cure the defect of false and misleading information." *Id.*

To determine the effect of false information in a warrant affidavit, we apply the test set forth by the Supreme Court in *Franks v. Delaware*, 438 U.S. 154 (1978). Under that decision, courts must determine (1) whether the affiant made "a false statement knowingly and intentionally, or with reckless disregard for the truth," *id.* at 155, and (2) whether, absent the false statement, "the affidavit's remaining content is insufficient to establish probable cause," *id.* at 156. If both conditions are satisfied, "the search warrant must be voided and the fruits of the search excluded." *Id.* The truthfulness at issue is that of the affiant, not the affiant's sources (other than government employees, *see United States v. Campbell*, 603 F.3d 1218, 1228 (10th Cir. 2010)); and honest errors by the affiant are not grounds for suppression. As the Court explained, "[Not] every fact recited in the warrant affidavit [must] necessarily [be] correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Franks*, 438 U.S. at 165. It suffices that "the information put forth is believed or appropriately accepted by the affiant as true." *Id.* "[N]egligence or innocent mistakes are insufficient to justify the exclusion of evidence." *Campbell*, 603 F.3d at 1228. "[W]e review only for clear error the district court's determinations regarding the truth or falsity of statements in the affidavit and regarding the intentional or reckless character of such falsehoods." *Id.* (internal quotation marks omitted).

Defendant's challenge fails on the first prong of the *Franks* test. The district court found that the inaccuracies Defendant complained of were "small inadvertent errors," R., Vol. 1 at 313 (Mem. Op. & Order Den. Def.'s Mot. to Suppress Evidence at 8, *United States v. Sanchez*, No. CR-10-2387 WJ (D. N.M. Nov. 22, 2010)) (Mem. Op.), and that mistakes made by the affiant and fellow officers were not made with "reckless disregard of the truth." *Id.* at 314 (Mem. Op. at 9). Defendant has not challenged these findings on appeal, and we see no clear error.

Further, we hold that the affidavit provided probable cause to search 4113 Barbara Vista even if the erroneous information is excluded. The affidavit stated:

> During the course of this wire intercept investigation agents intercepted Adriana Amaya talking to other members of this organization using cellular telephone (505) 907-1214. Cricket records show that the cellular phone is subscribed to by Adriana Amaya with a listed address of 4113 Barbara Vista SW, Albuquerque, NM (Subject Premises #1). Based on information derived from this investigation referenced below, (505) 907-1214 was found to be utilized by Adriana Amaya.

*Id.* at 150. Defendant argues that "even if there was evidence that one piece of mail might go to a certain address, that does not provide probable cause to believe that the person lives at that address." Aplt. Br. at 26. But we agree with the district court that the quoted information was "enough even alone to lead a prudent person to believe that there was a fair probability Amaya lived at 4113 Barbara Vista." R., Vol. 1 at 310 (Mem. Op at 5). Perhaps contrary information

could negate the probative value of the phone-company records. But the affidavit also stated that agents had determined that 4113 Barbara Vista was Amaya's current address through "information received . . . from state and local databases," *id.* at 150; and agent testimony at the suppression hearing confirmed, rather than contradicted, that statement.[1]

Defendant relies on our rejection of a warrant in *United States v. Roach*, 582 F.3d 1192 (10th Cir. 2009); but *Roach* is easily distinguishable. The affidavit in that case was tendered in support of an application to search 15 residences. It stated that the current residents of the targeted buildings had been confirmed through "investigations, which included checking for utilities information, driver's license records, real estate records, Wichita Police Department records, tax records, social security records, U.S. Postal Service records, interviews and/or surveillance." *Id.* at 1202 (internal quotation marks omitted). There was no effort to link specific investigatory techniques with particular residences to be searched. *See id.* at 1203. We observed that "[a] magistrate reading the statement would not, from the face of the affidavit, know which of the listed methods was used to verify that [the defendant] resided at 1441 N. Minneapolis," and thus the magistrate judge could not "determine independently whether the

---

[1] The district court did not clearly err in crediting the database searches. Although defense counsel offered tax records for 2011 indicating that Amaya's aunt (Defendant's sister) was the property owner, the warrant was approved in June 2010.

method employed to verify [the defendant's] residency succeeded in doing so." *Id*. In contrast, the affidavit here specifically stated the investigatory techniques used to verify Amaya's residence at 4113 Barbara Vista: searches of state and local databases and a telephone company's subscription records. Thus, the affidavit established probable cause to believe that Amaya lived at 4113 Buena Vista.

Finally, we note that "when police officers have probable cause to believe that a suspect is involved in drug distribution, there is also probable cause to believe that additional evidence of drug-trafficking crimes (such as drug paraphernalia or sales records) will be found in [her] residence." *Sanchez*, 555 F.3d at 914. Defendant does not challenge that inference.[2]

## II. RECORDS OF CALLS BETWEEN DEFENDANT AND DRUG TRAFFICKER

To put the evidentiary issue in context, we first summarize the pertinent evidence. The search of Defendant's home on June 9, 2010, established that it was being used by a substantial marijuana-distribution business. Officers found 550 pounds of marijuana in two outbuildings—a shed that was 10 to 15 feet from the house and a garage about twice as far from the house. Some of the marijuana was in plastic bags and horse-feed bags in the shed. The rest was concealed in 11

---

[2] The warrant for the initial search did not authorize a search for drugs. After the officers found marijuana, they stopped the search and obtained another warrant to search for drugs.

tires in the garage and shed. Also found in the garage and shed were a metal press suitable for fashioning bricks of marijuana, brown tape of a kind commonly used to package drugs, and two electronic scales that could be used to weigh different quantities of drugs. Lying on the grounds outside any building were some tires, some intact and some cut open, one of which matched a few tires in the shed. On the back porch was a rubber-cutting tool. Inside the house was a key ring with keys to the shed, the garage, and Defendant's truck; a triple-beam scale; and two prepaid cell phones. Officers testified at trial about the use by drug traffickers of scales, prepaid cell phones, packaging material, and home security cameras. Also, an officer testified about the methods used to smuggle marijuana from Mexico in tires of vehicles driven across the border. He opined that Defendant's home was being used as a stash house where marijuana was stored after being removed from tires that had previously been taken off the transit vehicles.

The central issue at trial was whether Defendant was involved in the marijuana enterprise. He testified that on June 4 he had left for a trip to Mexico, arriving home the evening before the June 9 search; that he had no knowledge of the marijuana; that he had given keys to the shed and garage to his children and to a man who leased the backyard for horses; and that he had never before seen the rubber-cutting tool found on the porch. The government produced a border

document showing that Defendant had entered Santa Teresa, New Mexico, from Mexico the day before the search.

Defendant refused to blame his children for the marijuana, but his attorney argued that they were the likely culprits. This theory of the defense probably accounts for Defendant's failure to object to the testimony about the investigation leading to the search. An officer explained that the investigation originally targeted a cocaine-trafficking organization that employed Defendant's adult son and adult daughter. According to the officer, intercepted calls showed that Defendant's son was involved with the delivery of cocaine to Albuquerque, while his daughter was a currency courier. Defendant, however, never came up in any of the wiretaps or surveillance leading to the search.

The evidence challenged by Defendant is phone records showing 128 calls from March 5, 2010, to the date of the search (June 9) between a phone subscribed to in the name of Alejandro Felix and the two prepaid cell phones found in Defendant's home. Felix, the evidence showed, was arrested with a load of marijuana in September 2010 in the border town of Columbus, New Mexico, and was later convicted of marijuana trafficking. The March date of the first call was significant because Defendant had quit his job as an electrician during that month. Defendant testified that after quitting his job, he fixed up and sold cars to make ends meet. He said that he had sold Felix three cars and had been calling Felix to inform him about upcoming auto auctions. On cross-examination,

however, the prosecution elicited that Defendant had no bills of sale for Felix's purchases and that Defendant had not deposited any sale proceeds in his bank account or reported them as income.

We review for abuse of discretion the district court's decision to admit the phone records. *See United States v. Cerno*, 529 F.3d 926, 935–36 (10th Cir. 2008). We see no abuse here. The district court could reasonably find that the phone records were relevant as making it more probable that Defendant was involved in marijuana trafficking. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). One could infer from the frequent calls to a marijuana smuggler that it was unlikely that Defendant was unaware of the marijuana operation being conducted at his home. Of course, the calls could be explained as relating to a different type of relationship with the smuggler, and Defendant attempted to provide such an explanation. But the jury could reasonably disbelieve that Defendant's dealings with Felix were limited to car sales.

We recognize that even relevant evidence should be excluded if its probative value is "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. And Defendant asserts that such a danger was present. He contends that evidence of his frequent calls to a convicted drug trafficker "provoked an emotional response in the jury and invited the jury to find

Defendant guilty by association." Aplt. Br. at 49. The argument is not frivolous. Courts are most sensitive to the danger that a defendant will be convicted just because he is a bad man or keeps bad company. But in this case the evidence of Defendant's relationship with Felix was unlikely to add any significant unfair prejudice. After all, Defendant's chief defense was to suggest that his two children were the true culprits. Absent any evidence that Defendant had attempted to repudiate his children's criminal activity, he was already significantly "tainted" by the evidence of their criminality. We note that one of this court's leading cases holding that evidence was inadmissible because of the risk of guilt by association was evidence in a drug prosecution that the defendant's sons were drug offenders. We wrote, "[E]ven if there was some tangential relevance to this evidence, the fact that it created the impression that most if not all members of Defendant['s] immediate family were involved in drug trafficking suggests that whatever probative value it may have had was substantially outweighed by its prejudicial effect." *United States v. Espinoza*, 244 F.3d 1234, 1240 (10th Cir. 2001). Yet here it was just this sort of evidence that Defendant used to argue his innocence. We think it unlikely that the risk of the jury's convicting Defendant because of "an emotional response" of "guilty by association" was significantly increased by evidence that Defendant associated with drug dealers in addition to his children.

-13-

The district court did not abuse its discretion in ruling that the probative value of the phone records was not substantially outweighed by the risk of unfair prejudice. Admission of the evidence was not error.

## III. SENTENCING ISSUES

At sentencing, the district court accepted the calculation of Defendant's Presentence Investigation Report (PSR) that Defendant's base offense level was 26 because of the quantity of marijuana involved in his offense. The court imposed a two-level increase for Defendant's obstruction of justice through his perjured trial testimony, resulting in an adjusted offense level of 28. The court denied Defendant's motion for a two-level reduction in offense level based on his allegedly minor role in the offense. After the court determined that Defendant's criminal-history category was I, Defendant's sentencing guidelines range was 78–97 months' imprisonment. The court sentenced Defendant to 78 months' imprisonment. Defendant challenges the court's application of the minor-role and obstruction-of-justice sentencing adjustments and the substantive reasonableness of his sentence. We address each contention in turn.

### A. Minor Role in Offense

Under USSG § 3B1.2(b) (2012), a defendant is entitled to a two-level decrease in offense level if he "was a minor participant in any criminal activity."[3]

---

[3] § 3B1.2 also provides for a four-level "minimal participant" offense-level reduction for a defendant who "was a minimal participant in any criminal

(continued...)

-14-

To receive the adjustment, the defendant has "the burden to prove by a preponderance of the evidence" that he was "less culpable than most other participants." *United States v. Ballard*, 16 F.3d 1110, 1114–15 (10th Cir. 1994); *see* USSG § 3B1.2 cmt. 3(A) (2012). Defendant contends that the district court's denial of the reduction was improper because the evidence at trial showed that he was merely maintaining a stash house for an unknown drug-trafficking organization and did not show that he had been involved in transporting drugs from Mexico, supervising others, selling drugs, or even profiting from his maintenance of the stash house. We review the lower court's decision for clear error. *See Ballard*, 16 F.3d at 1114.

The district court was not persuaded that Defendant was a minor participant, saying that "there's just no evidence . . . to support, you know, a mitigating role adjustment in this case." R., Vol. 3 pt. 2 at 714. We see no clear error. True, it is unclear precisely what Defendant's role was. But it was Defendant's burden to show that his role was minor. The evidence is fully consistent with his being an important component of a drug-distribution operation. The district court was not unreasonable in failing to be persuaded otherwise.

---

[3](...continued)
activity." USSG § 3B1.2(a) (2012). Defendant sought a minimal-participant adjustment in district court but does not pursue the point on appeal.

Defendant relies on *United States v. Hued*, 338 F. Supp. 2d 453 (S.D.N.Y. 2004), in which the district court granted a minimal-participant adjustment. It found (1) that the defendant had not become aware until a few weeks before her arrest that her boyfriend had been using her apartment as a heroin stash house, (2) that she had objected to his conduct, (3) that she did not derive any personal benefit from allowing her apartment to be used, and (4) that her sole active participation in the offense was to comply with his request on one occasion to deliver an envelope (which she suspected to contain drugs) to a person waiting downstairs. *See id*. at 454–56.

*Hued* is readily distinguishable. Here, the district court made no findings like those in *Hued*, nor would findings of that nature be supported by the evidence presented. Moreover, even if two district courts were somewhat inconsistent, it does not follow that the decision of one must have been clearly erroneous. Under the deferential clear-error standard of review, an appellate court can affirm both of two district courts that disagree about the implications of the same facts. *See United States v. McClatchey*, 316 F.3d 1122, 1128 (10th Cir. 2003) ("[W]e are not free to substitute our judgment for that of the district judge." (internal quotation marks omitted)).

## B. Obstruction of Justice

Defendant's PSR stated that he had perjured himself at trial and recommended an obstruction-of-justice enhancement to his offense level. Under

-16-

USSG § 3C1.1 (2012), a defendant is subject to a two-offense-level increase "[i]f (1) [he] willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . [his] offense of conviction." The guideline commentary provides examples of specific conduct to which the guideline applies, including "committing, suborning, or attempting to suborn perjury." *Id.* cmt. n.4(B).

Defendant asserted in his district-court sentencing memorandum that the PSR's sole basis for recommending the adjustment was the incompatibility of his testimony with the jury's verdict, and he argued that a finding of perjury on this basis would unconstitutionally burden his right to testify in his own defense. We do not fault his statement of the governing law. "The mere fact that a defendant testifies to his or her innocence and is later found guilty by the jury does not automatically warrant a finding of perjury. An automatic finding of untruthfulness, based on the verdict alone, would impinge upon the constitutional right to testify on one's own behalf." *United States v. Markum*, 4 F.3d 891, 897 (10th Cir. 1993) (citation omitted). The district court must make "a specific finding that independent of the jury verdict, defendant committed perjury." *Id.* at 898.

The district court, however, did not commit reversible error. In imposing the obstruction enhancement, it stated:

-17-

> Now, in this case, obviously, the defendant testified and he was under oath, and the—at trial, the defendant's, you know, the defense strategy and the defense was essentially it rested on the notion that the defendant did not have any knowledge of the marijuana, and therefore, he was not knowingly in possession of the marijuana. *In my view*, and again, based on the requirements under the guidelines for that enhancement, it was correctly applied because and *I'll make a finding that the defendant's testimony, and again, taking into account the jury's verdict, the defendant's testimony was perjured testimony when he testified under oath that he had no knowledge of the marijuana found in his garage and in his shed . . . .*

R., Vol. 3 pt. 2 at 715–16 (emphasis added). The court specifically identified the perjurious statement—Defendant's testimony that he did not know about the marijuana. And it did not base its finding of perjury solely on the jury's verdict. It stated that it was expressing "my view"; and although it took "into account the jury's verdict," it stated "*I'll* make a finding that . . . the defendant's testimony was perjured testimony." *Id.* (emphasis added). Defense counsel apparently had no questions about the basis of the court's perjury finding, because she raised no challenge after the court ruled.

## C.   Substantive Reasonableness

Defendant's final claim is that his sentence of 78 months' imprisonment, which was the guidelines minimum, was substantively unreasonable. We presume that a within-guidelines sentence is reasonable. *See United States v. Kristl*, 437 F.3d 1050, 1055 (10th Cir. 2006). Defendant has not overcome that presumption with his evidence of stable employment history, family ties, and the likelihood of deportation.

## IV. CONCLUSION

We AFFIRM Defendant's conviction and sentence.